USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 8/8/2022

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X
JOHMANNI ANDUZE,

                Plaintiff,

  -against-                            **REPORT AND RECOMMENDATION**

CITY OF NEW YORK, et al.,               21-CV-519 (PGG) (KHP)

                Defendants.

-------------------------------------------------------X
**TO: THE HONORABLE PAUL G. GARDEPHE, UNITED STATES DISTRICT JUDGE**
**FROM: KATHARINE H. PARKER, UNITED STATES MAGISTRATE JUDGE**

      *Pro se* Plaintiff Johmanni Anduze commenced this action seeking damages and

injunctive relief under 42 U.S.C. § 1983, alleging in his Second Amended Complaint[1] ("SAC")

that the City of New York and 39 individual Defendants violated his constitutional rights while

he was housed as a pre-trial detainee at the George R. Vierno Center ("GRVC") at Rikers Island.

In light of Plaintiff's *pro se* status, the Court construes the complaint as asserting claims that

Defendants: (1) imposed restrictions on him that violated Minimum Standards of the New York

City Board of Correction ("BOC"); (2) restricted his right to contact his attorney by mail and

telephone, (3) restricted his ability to contact his mother and grandmother; (4) imposed

restrictions on him in retaliation for his refusal to assault another inmate, Alexander Williams Jr.

("Williams"); (5) failed to provide medical care; (6) violated his rights by placing him in

enhanced restraints when outside of his cell; (7) used enhanced restraints on him without an

opportunity for a hearing in violation of due process; (8) imposed restrictions on him as a

punishment; (9) used excessive force; (10) denied him hot food; and (11) denied him

---

[1] Plaintiff twice amended his complaint.  All citations herein refer to the Second Amended Complaint, which is the
operative complaint.  (ECF No. 9.)

meaningful access to the courts.  Plaintiff further alleges that Defendant City of New York wrongfully instituted Command Level Order ("CLO 370.20") and negligently hired, retained, trained, and supervised its employees.

On November 8, 2021, the City of New York and Dr. Larry Blackmore made a motion to dismiss the SAC pursuant to Federal Rules of Civil Procedure 12(b)(6).  (ECF No. 31.)  On July 8, 2022, 36 individual Defendants who waived service joined the motion to dismiss. [2]  (ECF No. 56.)  Plaintiff did not oppose the motion.  For the reasons set forth below, I recommend that the motions to dismiss the SAC be granted in part and denied in part.

## FACTUAL ALLEGATIONS

The following facts, taken from the SAC, are presumed true for purposes of this motion and all reasonable inferences are drawn in Plaintiff's favor.  Plaintiff brings this case complaining about various conditions of confinement and treatment he received while he was a pretrial detainee at Rikers Island.  While Plaintiff was in the custody of the New York Department of Correction ("DOC"), Justice Donald Leo of the Supreme Court of the State of New York, Kings County, issued a Judicial Lockdown Order ("JLO") on May 15, 2020, directing

---

[2] Defendants who joined the motion to dismiss include: Captain Mark Ballah, Shield No. 1219; Former Assistant Deputy Warden ("ADW") Wanda Blair; Captain Andrei Blake, Shield No. 89; Former DOC Commissioner Cynthia Brann; ADW Tyrone Carter, Shield No. 94; Captain Denise Carter, Shield No. 1092; CO Kewanee Drumwright, Shield No. 8667; Former CO Tyliek Dyches; Former CO Timothy Edmund; Former DOC General Counsel Heidi Grossman; ADW Shanele Henry, Shield No. 1038; CO Andrew Hickson, Shield No. 5395; Chief Hazel Jennings, Shield No. 22; CO Luther Keys, Shield No. 19103; Captain Erica Law, Shield No. 85; CO Julius Lawrence, Shield No. 10351; Captain Charles Loiseau, Shield No. 1898; Captain Bernard Mathis, Shield No. 82; Deputy Warden Joanne Matos, Shield No. 595; CO Willie McNeil, Shield No. 12557; Captain Kishna Molina, Shield No. 1165; Former CO Jennifer Montenegro; Captain Paul Moodie, Shield No. 593; Deputy Warden Tiffany Morales, Shield No. 4; CO Victor Nzeama, Shield No. 6774; CO Johanny Ramirez, Shield No. 15685; Warden Jean Rene, Shield No. 627; CO Preston Ritter, Shield No. 7994; CO Wilson Rodriguez, Shield No. 9665; Chief of Operations Becky Scott, Shield No. 25; Deputy Warden Jonelle Shivraj, Shield No. 604; Chief Kenneth Stukes, Shield No. 19; CO Shanell Taylor, Shield No. 8644; Captain Fanny Vallejo, Shield No. 924; CO Kevin White, Shield No. 8507; CO Kevin Young, Shield No. 12268.

that Plaintiff be subject to certain restrictions because of his assessment that Plaintiff posed a

significant risk to the safety of potential witnesses against him.  (ECF No. 32-2.)

    **1.  <u>JLO</u>**

    The JLO, as amended, imposed restrictions on Plaintiff's housing, visits and phone calls,

movement and transportation, property, mail, shower, recreation, and services.  (ECF No. 32-2.)

More specifically, the JLO directed, *inter alia*, that: (1) Plaintiff be housed in a highly secured 23-

hour lockdown area, on lock-in, feed-in status, be separated from other inmates in the area in

such a manner to prevent him from communicating with or passing materials to other inmates;

(2) Plaintiff's telephone calls be permitted only to his attorneys, mother and grandmother, and

no visitation privileges excepted by his attorney; (3) Plaintiff be searched each time he is

removed or returned to his cell; (4) Plaintiff be restrained in handcuffs when transported

outside of the facility and treated the same way when in a court detention facility; (5) Plaintiff

and his cell be searched each day and he not be permitted to possess any envelopes or postage

stamps or to purchase them from the commissary; (6) Plaintiff not be permitted to send out

any mail and/or his outgoing mail be inspected to determine if it contain any threats or an

attempt to have others convey threats, his incoming mail be screened weekly and prohibited

letters be kept for Plaintiff unopened, whereas permitted letters be read to him; (7) Plaintiff be

afforded regular showers as outlined by the DOC and, to the extent that DOC can arrange a

mutually agreeable procedure, be provided with a period of recreation daily; and (8) if

requested, Plaintiff be provided law library, commissary, and religious services inside his cell

and permitting Plaintiff to be removed from his cell only for medical services, for which a log

must be kept.  (ECF No. 32-2.)  The JLO was amended on October 1, 2020, modifying paragraph

4 to allow telephone calls to Plaintiff's mother and grandmother.  (ECF No. 32-3.)  On June 8,

2021, about 13 months after it was imposed, all restrictions imposed by the JLO were lifted.

(ECF No. 32-4.)

### 2. Plaintiff's Arrival at GRVC and CLO 370.20

Pursuant to the court's JLO, DOC designated Plaintiff as a centrally monitored inmate

who was placed in a centrally monitored case ("CMC") housing unit with waist chains and leg

irons to be worn when outside the facility and during transport.  (ECF No. 9 pp. 54-60, SAC Ex.

A.)  On November 2, 2020,[3] Plaintiff, who was initially detained at the Manhattan Detention

Complex, was moved to the GRVC housing unit 1a on Rikers Island where he was subject to CLO

370.20.  (SAC ¶¶ 1, 3.)

CLO 370.20 states that its purpose is "to establish policy and procedures for the Care,

Custody and Control of the inmates under Court Ordered lockdown status."  (ECF No. 9, p. 55,

SAC Ex. A.)  It provides that the inmates housed in court-ordered lockdown status shall be in

"[t]wenty-three (23) hour lock-in, fed-in status" and shall be allowed to possess in their cell one

Bible, three magazines, three books, one bar of soap, one container of shampoo, one

toothbrush, one toothpaste, one plastic cup, one towel and a deodorant.  (*Id.*)  It also provides,

*inter alia*, that: (1) "[i]nmates in lock-down status shall not be removed from their cells unless a

Captain is present;" (2) "[w]henever a Court Ordered Lock-Down Inmate is removed from the

housing area, he shall be restrained in leg irons, waist chains and mitts" and "shall be under

one-on-one observation of a Correction Officer to assure no communication with any other

inmate(s), verbally, in writing or through hand signs;" (3) "these inmates shall be strip-searched,

---

[3] The Court notes that the events at Rikers took place during the COVID-19 pandemic.

and their property carefully searched on a daily basis;" (4) "[i]nmates will make all requests for

Law Library materials in writing," which "will be forwarded to the Security Office who will

obtain copies of the requested materials and place same in the inmate blue storage bin;" (5)

"[t]he assigned Captain will collect all letters written by the inmate" and "will turn them over to

the Security Office," and no inmates in court-ordered lockdown status will be permitted to send

out any written or other type of communication; (6) "[t]he court ordered inmates are barred

from Visits and Telephone calls to anyone other than their attorney of record," and "[a]ll calls

will be placed between the hours of 1330 -1430 hours and 1630-1730 hours;" (7) "[i]nmates will

be afforded a ten-minute shower, three (3) times per week," and "a captain shall be present

when the inmate is removed from his cell to the shower and again when he is returned from

the shower to his cell;" (8) no incoming mail shall be forwarded to the inmates housed in the

court-ordered areas until first forwarded to the GRVC Security Office and "approved by the

Commanding Officer or his/her designee;" (9) "[t]he only items inmates housed in Court

Ordered areas may purchase from commissary are: 1. Soap 2. Shampoo 3. Deodorant 4.

Toothpaste 5. Paper;" (10) "[i]f these inmates request religious services, the Chaplain will be

called to visit them;" (11) "[a]ny necessary medical or mental health services are to be provided

to these inmates in the housing area," and they "will not be removed to go to the Clinic unless

it is physically impossible to provide them with necessary medical services in the cell/housing

area;" and (12) inmates "may be afforded recreation in accordance with the details delineated

in the court order or as amended in a separate memo," and they "will be restrained in waist

chains handcuffs and mitts whenever they are out of their cells for recreation."  (ECF No. 9, p.

55-59, SAC Ex. A.)

### 3. __Minimum Standards__

Plaintiff asserts that subjecting him to CLO 370.20 violates the BOC's Minimum

Standards, which provide that: (i) "all prisoners shall be permitted to shave daily" and "to

shower daily" (SAC ¶ 28, Minimum Standard 1-03(c)(1)-(2)); (ii) recreation "shall be at least one

hour" and shall "be available seven days a week in the outdoor recreation area" (SAC ¶ 30,

Minimum Standard 1-06(c)); (iii) all prisoners "shall be granted access to facility law library for a

period of at least two hours on each that the law library is open[ ]" (SAC ¶ 32, Minimum

Standard 1-08(f)(4)); (iv) "all prisoners shall have reasonable access to type writer [sic],

dedicated word processors and photocopies for the purpose of preparing legal documentation"

(SAC ¶ 32, Minimum Standard 1-08(g)(2)); (v) "correctional personnel shall never prohibit delay

or cause to prohibit or delay inmates access to care or appropriate treatment.  All decisions

regarding need for medical attention shall be made by health [c]are personnel." (SAC ¶ 36,

Minimum Standard 3-02(b)(4)); and (vi) "medical treatment or physical examination shall not

occur outside of appropriate treatment areas . . . except as needed in the event of an acute

medical emergency."  (SAC ¶ 36, Minimum Standards 3-06(b)(5)).

### 4. __Plaintiff's Complaints__

#### a. *Denials of Phone Calls, Showers, Razor, Typewriter, Recreation, Commissary, and Serving Cold Food and Without a Certificate*

Plaintiff alleges that his requests to call his mother and grandmother were denied on

November 3, 2020.  (SAC ¶ 2.)  However, Plaintiff does not identify which prison official denied

his request.  On November 4, 2020, Plaintiff again requested to make phone calls, but was

denied by CO Drumwright and ADW Henry.  (SAC ¶¶ 7-8.)

On November 3, 2020, Deputy Warden Jonelle Shivraj ('Shivraj") and ADW Henry denied

Plaintiff's request to shower.  (SAC ¶¶ 3-4.)  On November 4, 2020, Plaintiff was again denied

the ability to shower by CO Drumwright and ADW Henry.  (SAC ¶¶ 7-8.)  On November 5, 2020,

CO Ramirez denied Plaintiff a shower and a razor.  (SAC ¶¶ 12, 16.)  On the same day, CO

Edmunds also denied his request to shower.  (SAC ¶ 19.)  On November 6, 2020, CO Ramirez

and Captain Carter denied Plaintiff's shower request, however, Warden Sherma Dunbar

("Dunbar") allowed him to shower later in the day.  (SAC ¶¶ 22, 24, 26.)  On November 7, 2020,

Captain Vallejo denied Plaintiff's request for a razor.  (SAC ¶¶ 28, 30.)  On November 10, 2020,

CO Taylor and Captain Loiseau denied Plaintiff's requests for a shower and a razor.  (SAC ¶¶ 41,

42.)  On, November 22, 2020, Captain Blake denied his request for a shower.  (SAC ¶ 56.)

Lastly, on November 28, 2020, CO Montenegro denied Plaintiff's requests to shower and for a

razor.  (SAC ¶ 61.)

In connection with recreation, on November 5, 2020, CO Ramirez denied Plaintiff's

request for recreation.  (SAC ¶¶ 12, 16.)  On November 7, 2020, Captain Vallejo denied

Plaintiff's request for recreation.  (SAC ¶¶ 28, 30.)  Plaintiff also asserts that the recreation yard

did not have any equipment for him to use.  (SAC ¶ 52.)  Additionally, from January 29 to March

4, 2021, Plaintiff had to wake up at 6 a.m. to place himself on the recreation list for each day.

(SAC ¶ 76.)  According to Plaintiff, this was a punishment because recreation was supposed to

be afforded daily without having to wait up all night.  Plaintiff was denied a television in his cell

and his right to purchase items from the commissary.  (SAC ¶ 77.)

Plaintiff alleges that his lunch was served cold and prepared outside his presence and

without a food handling certificate on November 3 by CO Drumwright (SAC ¶ 9), November 4

by CO Nzeama (SAC ¶ 11), and November 5 by CO Ramirez (SAC ¶ 14).  Of note on November 3rd and 5th, 2020 ADW Henry told Plaintiff that their treatment in the housing unit was punishment for lawsuits instituted by another inmate, Alexander Williams.  (SAC ¶¶ 4, 17.)

### b. *Attorney Communication and Legal Mail*

Plaintiff alleges that his request to call his attorney was denied on November 3, 2020 by an unidentified prison official.  (SAC ¶ 2.)  He asserts that on November 7, 2020, CO Ritter and CO Hickson purposely stood in front of his cell door when he was discussing his criminal and civil cases with his attorney.  (SAC ¶ 31.)  Because of this alleged violation, Plaintiff requested to use a typewriter to write to the court to complain about his conditions at GRVC.  (SAC ¶ 32.)  This request was denied by a prison official because Plaintiff's housing unit did not have a typewriter for use.  (*Id.*)

On October 26, 2020, Plaintiff's mail to his attorney was censored by CO Hickson and CO K. Young, who informed Plaintiff that he had to read all Plaintiff's outgoing mail.  (SAC ¶ 34.)  On November 13, 2020, Plaintiff was not allowed to send any mail by CO Ritter, CO Hickson, CO White, and Warden Dunbar.  (SAC ¶¶ 43, 45.)  On November 15, 2020, CO K. Young denied Plaintiff's outgoing mail to both his attorney and mother.  (SAC ¶ 49.)  On November 20, 2020, Warden Dunbar informed Plaintiff that the Deputy Warden of Security Shivraj makes decisions concerning inmates' mail and that the staff will adhere to CLO 370.20's restrictions concerning his mail.  (SAC ¶ 54.)

According to Plaintiff, CO K. Young stated that Plaintiff's packet to his attorneys that Plaintiff handed him on December 22, 2020, would not be sent unless Plaintiff handled "that business" with inmate Williams.  (SAC ¶¶ 67-68.)  Capt. Molina, CO K. Young and CO W.

Rodriguez "admitted on Jan. 5, 2021" that his mail to his attorney "was held since Dec. 22, 2020," and opened and inspected without notifying him.  (SAC ¶ 87.)  Plaintiff admits that on January 5, 2021, CO Harris sent out Plaintiff's packet to his attorneys after he reviewed Plaintiff's JLO and discovered there were no mail restrictions.

### c.  *Medical Claims*

Plaintiff alleges that his mental health medication was denied on November 5, 2020 by an unidentified prison official, and on November 6 by CO Ramirez (SAC ¶ 22) and Captain Carter (SAC ¶ 24).  On November 8, CO K. Young brought Plaintiff his mental health medication instead of medical personnel.  (SAC ¶ 36.)  On November 27, Plaintiff asked to see the medical staff for left shoulder pain after being assaulted by CO Lawrence the previous night because Plaintiff set a fire in in his cell.  This request was denied by an unidentified prison official who advised Plaintiff to ask medical staff directly.  (SAC ¶ 60.)

Dr. Blackmore and Dr. Gemo

On November 9, 2020, Dr. Blackmore, when completing his rounds in Plaintiff's housing unit, refused to examine Plaintiff for shoulder pain because of CLO 370.20.  On November 16, 2020, Plaintiff informed Dr. Blackmore that he needed mental health personnel to discuss suicidal thoughts but was informed that permission was needed from the Warden due to the CLO 370.20.  (SAC ¶ 50.)  On November 19, 2020, Plaintiff asked Dr. Gemo to be examined due to constant pain in his shoulder despite pain medication, but Dr. Gemo explained that Plaintiff would have to be examined through his cell door due to CLO 370.20.  (SAC ¶ 53.)

### d. Allegations of Retaliation

Plaintiff asserts that CO Ramirez denied his request to file a grievance on November 6, 2020.  (SAC ¶ 23.)  CO K. Young insulted Plaintiff calling him "Lil Nigga" and stated that medical staff is never allowed inside the unit "for your little rapist ass" because of CLO. 370.20.  (SAC ¶ 36.)  CO McNeil stated to Plaintiff when he allowed a phone call: "Okay so this is the rapist mother-fucker Dunbar was talking about" and asked Plaintiff how he would like it if he "raped your mother."  (SAC ¶ 37.)

On November 13, 2020, Warden Dunbar informed Plaintiff that he should blame inmate Williams for the censoring and denial of his outgoing mail and noted "this is coming directly from my division chief."  (SAC ¶ 44.)  CO K. Young told Plaintiff to stop asking about the mail or he will not be allowed to make phone calls during his shifts.  (SAC ¶ 57.)  Because of the alleged retaliation, Plaintiff was sleepless and contemplated suicide, which was exacerbated by CO K. Young who continuously talked to Plaintiff's mother on the phone and made comments regarding Plaintiff's criminal charges.  (SAC ¶ 62.)  On December 27, 2020, CO K. Young informed Plaintiff that restrictions on him would continue until Plaintiff and other inmates "figure[d] out a way to get" inmate Williams to stop his complaints because he was the reason why restrictions were imposed on everyone else.  (SAC ¶¶ 63-64, 66.)  CO K. Young approached Plaintiff again on January 29, 2021, offering more access to phone calls if Plaintiff would cause harm to inmate Williams. Plaintiff filed a grievance about the calls to harm Williams which is still pending.  (SAC ¶ 75.)  Further, Plaintiff alleges that the Defendants knew that he did not have any restrictions, but they acted in concert and imposed them on him in retaliation for his refusing to assault inmate Williams.  (SAC ¶¶ 88-91.)

On December 30, 2020, CO K. Young informed Plaintiff that he was going to be moved out of the 23/1 lockdown, but that was not going to happen unless Plaintiff "take care of that business" with inmate Williams.  (SAC ¶¶ 66-67.)  When Plaintiff complained to ADW Blair that the prison officials were not adhering to his JLO on January 8, 2021, ADW Blair stated that, despite the order modification lifting 23/1 lockdown, Plaintiff would remain in lockdown.  (SAC ¶ 73.)

### e. Enhanced Restraints and Use of Excessive Force

Plaintiff alleges that placing him in enhanced restraints violated his right to be free from the use of excessive force.  On November 4, 2020, Plaintiff was placed in enhanced restraints with black gloves and leg irons by CO Hickson, CO Ritter, CO Reid, CO McNeil, CO White and Captain Mathis.  (SAC ¶ 6.)  On the same day, CO K. Young placed a notice on Plaintiff's cell door, indicating that Plaintiff must be placed in enhanced restraints and subjected to a 3-point search each time he is moved.  (SAC ¶ 10.)  On November 9, 2020, Plaintiff was placed in enhanced restraints by Captain Moodie and CO Montenegro to be taken to shower.  (SAC ¶ 39.)  On November 17, 2020, under Captain Law's order, CO Dyches and two unidentified persons handcuffed Plaintiff and strip-searched him in an area not designated for that purpose and placed Plaintiff in enhanced restraints before he was allowed in the yard for recreation.  (SAC ¶¶ 51-52.)

According to Plaintiff, CO Lawrence used excessive force against him on November 26, 2020, when Plaintiff was stuck in his cell after Plaintiff set a fire to it and was subsequently attacked by CO Lawrence when he was hanging off the railing of the top tier.  (SAC ¶ 107.)

**LEGAL STANDARD**

1. <u>**Motion to Dismiss Under Rule 12(b)(6)**</u>

When considering a motion to dismiss for failure to state a claim upon which relief can be granted under Rule 12(b)(6), the Court must accept all factual allegations in the complaint as true and draw all inferences in the Plaintiff's favor.  *Littlejohn v. City of New York*, 795 F.3d 297, 306-07 (2d Cir. 2015).  To survive a motion to dismiss, the complaint must contain "sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  While detailed factual allegations are not required, the complaint must contain more than mere "labels and conclusions."  *Iqbal*, 556 U.S. at 678.  It must contain more than "naked assertion[s] devoid of further factual enhancement" and a "formulaic recitation of the elements of a cause of action."  *Id.* (internal citation and quotation marks omitted).  As the Supreme Court explained in *Iqbal*, the "plausibility standard" asks for "more than a sheer possibility that a defendant has acted unlawfully."  *Id.*  "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims."  *Villager Pond, Inc. v. Town of Darien,* 56 F.3d 375, 378 (2d Cir. 1995).  Dismissal is appropriate only when it "appears beyond a doubt that the plaintiff can prove no set of facts which would entitle him or her to relief."  *Sweet v. Sheahan*, 235 F.3d 80, 83 (2d Cir. 2000).

"It is well established that the submissions of a *pro se* litigant must be construed liberally and interpreted 'to raise the strongest arguments that they *suggest.*'"  *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) (quoting *Pabon v. Wright*, 459 F.3d 241, 248 (2d Cir. 2006)).  At the motion to dismiss stage, the Court may consider any document

"attached to [the complaint] as an exhibit or any statements or documents incorporated in it by reference," as well as "documents that the plaintiffs either possessed or knew about and upon which they relied in bringing the suit[.]" *Rothman v. Gregor*, 220 F.3d 81, 88 (2d Cir. 2000) (citations omitted).

### 2. Claims Under 42 U.S.C. § 1983

Section 1983 provides, in relevant part, that: "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured[.]" 42 U.S.C. § 1983. Section 1983 "is not itself a source of substantive rights, but a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes that it describes." *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979); *see also Patterson v. County of Oneida*, 375 F.3d 206, 225 (2d Cir. 2004). To state a claim under § 1983, "a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988) (citation omitted).

Failing to allege that a defendant was personally involved in, or responsible for, the conduct complained of renders a complaint "fatally defective on its face." *Alfaro Motors, Inc.* v. *Ward*, 814 F.2d 883, 886 (2d Cir. 1987) (quoting *Black v. United States*, 534 F.2d 524, 527-28 (2d Cir. 1976)). Equally, "group pleading," which "fail[s] to differentiate as to which defendant was involved in the alleged unlawful conduct," is insufficient to state a claim under Section 1983. *Myers* v. *Moore*, 326 F.R.D. 50, 60 (S.D.N.Y. 2018) (quoting *Leneau v. Ponte*, 2018 WL 566456, at

*15 (S.D.N.Y. Jan. 25, 2018)).  To satisfy Rule 12(b)(6), a plaintiff must make "specific factual

allegations" against each defendant.  *Thomas* v. *Venditto*, 925 F. Supp. 2d 352, 363 (E.D.N.Y.

2013) (citation omitted).

To establish a *Monell* claim to hold a municipality "liable under [Section] 1983 for the

unconstitutional actions of its employees, a plaintiff is required to plead and prove three

elements: (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a

denial of a constitutional right."  *Batista v. Rodriguez*, 702 F.2d 393, 397 (2d Cir. 1983).  The

plaintiff may show the existence of such a policy or custom by identifying any of the following:

(i) an express policy or custom; (ii) an authorization of a policymaker of the unconstitutional

practice; (iii) failure of the municipality to train its employees, which exhibits a "deliberate

indifference" to the rights of its citizens; or (iv) a practice of the municipal employees that is "so

permanent and well settled as to imply the constructive acquiescence of senior policymaking

officials."  *Corley* v. *Vance*, 365 F. Supp. 3d 407, 438 (S.D.N.Y. 2019) (quoting *Biswas v. City of

New York*, 973 F. Supp. 2d 504, 536 (S.D.N.Y. 2013)), *aff'd sub nom. Corley* v. *Wittner*, 811 F.

App'x 62 (2d Cir. 2020); *see also Outlaw* v. *City of Hartford*, 884 F.3d 351, 372-73 (2d Cir. 2018)

(discussing what constitutes official municipal policy and deliberate indifference).

### 3.  **Qualified Immunity**

"Qualified immunity shields government officials from liability for civil damages as a

result of their performance of discretionary functions and serves to protect government

officials from the burdens of costly, but insubstantial, lawsuits."  *Lennon v. Miller*, 66 F.3d 416,

420 (2d Cir. 1995) (citation omitted).  "Government actors performing discretionary functions

are 'shielded from liability for civil damages insofar as their conduct does not violate clearly

established statutory or constitutional rights of which a reasonable person would have known.'" *Id.* (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)); *City of Tahlequah v. Bond*, 142 S. Ct. 9, 11 (2021).  The immunity protects a government actor if it was "objectively reasonable" for him to believe that his actions were lawful at the time of the challenged act."  *Id.* (quoting *Anderson v. Creighton*, 483 U.S. 635, 640, 641 (1987)).  "The objective reasonableness test is met—and the defendant is entitled to immunity—if 'officers of reasonable competence could disagree' on the legality of the defendant's actions."  *Id.* (quoting *Malley v. Briggs*, 475 U.S. 335, 340-41 (1986)).  The doctrine protects "all but the plainly incompetent or those who knowingly violate the law."  *City of Tahlequah*, 142 S. Ct. at 11 (citing *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018)).

It is well settled in this Circuit that a defendant's ability to rely on qualified immunity is a question of law for the court to decide *only* when the facts are not in dispute.  *Lennon,* 66 F.3d at 421 (2d Cir. 1995).  In the context of a motion to dismiss, it must be clear from the face of the pleading that conduct of the officer was objectively reasonable as a matter of law.  *Cf. Iqbal*, 556 U.S. at 671-672 (recognizing that denial of claim of qualified immunity on Rule 12(b)(6) motion can fall "within the narrow class of appealable orders despite 'the absence of a final judgment'"); *Ford v. Miller*,  2019 WL 6831640, at *14 (S.D.N.Y. Aug. 23, 2019), *report and recommendation adopted,* 2019 WL 4673445 (S.D.N.Y. Sept. 25, 2019) (on motion to dismiss, finding officers entitled to qualified immunity because plaintiff failed to state a claim for violation of his constitutional rights; law was clear that plaintiff's complaints did not constitute a protectable liberty interest).

**DISCUSSION**

1.  **RULE 8(A)(2) OF THE FEDERAL RULES OF CIVIL PROCEDURE**

Defendants argue that Plaintiff's SAC, consisting of 152 paragraphs and seven exhibits and containing "plaintiff's personal opinions, recitation of alleged arguments with Correction Officers," his "personal conversations," and alleged conversations between other inmates and CO's, should be dismissed for failure to comply with Federal Rule of Civil Procedure 8(a)(2), which requires that a pleading "contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).

Dismissal of a complaint for failure to comply with Rule 8(a)(2) "is usually reserved for those cases in which the complaint is so confused, ambiguous, vague, or otherwise unintelligible that its true substance, if any, is well disguised."  *Salahuddin v. Cuomo*, 861 F.2d 40, 42 (2d Cir. 1988) (citations omitted).  Rule 8(a)(2) does not prohibit allegations of Plaintiff's personal opinions and conversations with and among others, and Defendants do not assert that the SAC is confusing, ambiguous, vague, or unintelligible.  Thus, dismissal of the SAC pursuant to Fed. R. Civ. P. 8(a)(2) is not warranted.

2.  **LACK OF PERSONAL INVOLVEMENT**

"It is well settled in this Circuit that 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.'" *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (quoting *Moffitt v. Town of Brookfield*, 950 F.2d 880, 885 (2d Cir.1991)).

> [T]here is no special rule for supervisory liability.  Instead, a plaintiff must plead and prove that each Government-official defendant, through the official's own individual actions, has violated the Constitution.  The factors necessary to establish a [§ 1983] violation

16

> will vary with the constitutional provision at issue because the
> elements of different constitutional violations vary.  The violation
> must be established against the supervisory official directly.

*Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020) (cleaned up).

Defendants argue that Plaintiff failed to allege any specific facts indicating personal involvement in the alleged violations of his rights by the following Defendants: (1) Chief Becky Scott; (2) Chief Hazel Jennings ("Jennings"); (3) Heidi Grossman (Grossman"); (4) Tiffany Morales ("Morales"); (5) Joanne Matos ("Matos"); (6) Deputy Warden Blair ("Blair"); (7) Recreational Officer Keys ("Keys"); (8) Security Officer W. Rodriguez ("Rodriguez"); (9) Kenneth Stukes ("Stukes"); and (10) Cynthia Brann ("Brann").

In reviewing the SAC, none of the paragraphs contain allegations against Morales, Matos, Keys, Stukes, Brann and Jean Rene ("Rene").  Although the names of Morales and Matos appear in connection with CLO 370.20, no specific allegations are asserted against them. Likewise, Plaintiff fails to supply specific factual allegations of personal involvement to render his claims plausible against Defendants Jennings, Scott, and Grossman.  Plaintiff only alleges that: (a) ADW Henry told Plaintiff that Jennings and Scott want "yall housed here as punishment" (SAC ¶ 17); (b) Jennings, Scott and Grossman were "aware that the plaintiff should not [have] restrictions that were not listed within his Supreme Court Lock Down Order" and "this factor was being ignored and purposely so in order to retaliate against one inmate for prior civil litigation that the plaintiff had nothing to do with" (SAC ¶29); and (c) Jennings and Grossman were "informed in regards to another inmate matter pertaining to properly accessing the facility law library" (SAC ¶ 33).

Similarly, although mentioned within the SAC, Plaintiff fails to allege that Blair and

Rodriguez violated his Constitutional rights.  As to Blair, Plaintiff only alleges that, while touring

the housing unit on January 8, 2021, she informed him that his court order "was modified to

include 8 or 16 hour[s] of rec a day," but Chief Scott stated that Plaintiff will not be moved

unless the judge comes to G.R.V.C. and moves Plaintiff himself.  (SAC ¶ 73.)  However, Plaintiff

fails to allege that Blair violated his Constitutional rights.  Although Rodriguez is mentioned in

several paragraphs, such as informing Plaintiff that the mail of inmates in his housing unit had

to be verified pursuant to the CLO, Plaintiff includes no facts or conduct by Rodriguez that rise

to a Constitutional violation.[4]  (*See* SAC ¶¶ 54, 57, 72, 74.)  Accordingly, I recommend

dismissing the claims against Scott, Jennings, Grossman, Morales, Matos, Blair, Keys, Rodriguez,

Stukes, Brann and Rene for lack of personal involvement.  *Alfaro Motors, Inc.*, 814 F.2d at 886.

3. <u>**MINIMUM STANDARDS VIOLATIONS**</u>

As a threshold matter, when evaluating each of Plaintiff's claims, they must be analyzed

bearing in mind that he was subject to a court issued Lockdown Order which precipitated the

CLO.  Thus, a penological purpose for the restrictions — the implementation of a state court

lockdown order — is presumptively valid, at least insofar as the CLO's requirements are

consistent with the state court's Lockdown Order.  *See Avery v. Turn Key Health Clinics, LLC*,

2020 WL 714176, at *9 (W.D. Ark. Feb. 12, 2020), *aff'd*, 839 F. App'x 26 (8th Cir. 2021) (noting

that "Security of the criminal justice process, enforcement of a court's orders, protection of

victims and witnesses are legitimate penological interests"); *see also Hubbard v. Johnson*, 2019

---

[4] Plaintiff also alleges that Rodriguez failed to come to the unit thereby denying him the ability to make a phone call.  As discussed below, this alleged violation does not amount to a Constitutional violation.

WL 5579507, at *4 (N.D. Cal. Oct. 29, 2019); *Pickford v. Lake Cnty. Cmty. Correction*, 2015 WL

3822262, at *2 (N.D. Ind. June 19, 2015).

Defendants argue that to, the extent Plaintiff's claims are based on a violation of the

BOC's Minimum Standards, no claim under Section 1983 can lie insofar as the Minimum

Standards do not set the Constitutional standard.

Although the Second Circuit does not appear to have ruled on the issue, District Courts

in this Circuit consistently have found that BOC's Minimum Standards do not, standing alone,

establish a violation of a federally guaranteed right for purposes of Section 1983.  *Knight v.

Mun. Corp.*, 2016 WL 4030632, at *6 n.7 (S.D.N.Y. July 26, 2016); *Winters v. City of New York*,

2020 WL 4194633, at *5 (S.D.N.Y. July 21, 2020); *Walker v. Shaw*, 2010 WL 2541711, at *6

(S.D.N.Y. June 23, 2010) (collecting cases).  The rationale for these decisions is that the

Minimum Standards, set by state law, are tantamount to procedural guidelines for prisons that

the state chooses to require.  *Korkala v. N.Y.C. Dep't of Corr.*, 1986 WL 9798, at *4-5 (S.D.N.Y.

Sept. 4, 1986) (citation omitted).  Thus, to the extent they require more than what is required

by the Constitution, they do not form the basis of a claim under Section 1983.  To the extent

that the Minimum Standards align with Constitutional standards, those are addressed

separately below when addressing the Constitutional claims.  Accordingly, as violations of the

Minimum Standards in and of themselves do not establish the basis for the deprivation of

Constitutional right, I recommend that Plaintiff's claims for violation of the Minimum Standards

be dismissed.

4.   **CONDITIONS OF CONFINEMENT**

     a.   ***Qualified Immunity***

Defendants argue that "where, as here, correction officers act at the direction of a facially valid directive they are entitled to qualified immunity."  *See Varrone v. Bilotti*, 123 F.3d 75, 81-82 (2d. Cir. 1997).  However, Defendants' reliance on *Varrone* is misplaced.  In *Varrone*, which involved a prison visitor's Fourth Amendment right to be free from unreasonable searches and seizures, the court found:

> Since the four subordinate officers were merely carrying out Malone's [(the Inspector General for the New York State Department of Correctional Services)] instruction and that of their immediate superior when they ordered the strip search, they were entitled to the same immunity Malone had.  There is no claim that the order was facially invalid or obviously illegal; prison strip searches are not uncommon.  To require the four officers independently to investigate the basis for the apparently valid order they received, as a condition to having the same qualified immunity that the source of the order (Malone) had, would create serious problems in the administration of a prison and be detrimental to the maintenance of proper order and discipline there.

*Id.*

Unlike in *Varrone*, which did not involve a claim that the order in that case was facially invalid, Plaintiff here challenges the validity of CLO 370.20 and its restrictions.  Defendants do not argue that Plaintiff does not have Constitutional rights to basic life necessities, including hygiene, exercise, communication with his attorney and outgoing mail; rather, they concede that Plaintiff has those rights, but argue that sporadic deprivations of showers and razors (Def.'s Br. at 10-11), recreation time (*id.*), food (*id.* at 13), phone calls to his attorneys, and outgoing mail (*id.*) are not sufficient to state a claim for unconstitutional conditions of confinement. Defendants' conclusory assertion in their memorandum of law that CLO 370.20 "is facially valid

in imposing additional restrictions and procedures applicable to the lock-down unit" is not sufficient as a matter of law at this stage to confer qualified immunity protection in the circumstances of this case regarding Plaintiff's claim of unconstitutional conditions of his confinement.  Thus, dismissing the SAC based on the argument that Defendants are entitled to qualified immunity because they acted at the direction of a facially valid directive is not warranted.

> **b.  *Denials of Phone Calls, Showers, Razor, Recreation, Commissary and Serving Food Cold and Without a Certificate***

Defendants argue that there is no Constitutional right to a daily shower, and sporadic denials of razor and outdoor recreation do not rise to the level of a Constitutional violation.

The Constitution requires that prison officials "provide humane conditions of confinement" and "ensure that inmates receive adequate food, clothing, shelter, and medical care." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994).  "The Constitution does not mandate comfortable prisons, but neither does it permit inhumane ones[.]"  *Id.* (internal quotation marks and citation omitted).  When a plaintiff is a pretrial detainee, as here, claims related to conditions of confinement are analyzed under the Due Process Clause of the Fourteenth Amendment.  When evaluating such a claim, courts look to "contemporary standards of decency."  *Darnell v. Pineiro,* 849 F.3d 17, 29 (2d Cir. 2017).

To state a claim for deliberate indifference to conditions of confinement, a plaintiff must show that the deprivation was both objectively serious and that the defendant official acted with sufficient mens rea, (the "subjective" prong of the test).  Under the subjective prong, the plaintiff must show that the defendant was deliberately indifferent to any objectively serious condition of confinement.  *Id*. at 32.  Under the Fourteenth Amendment, this can be shown

with evidence that the "defendant official acted intentionally to impose the alleged condition, or recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant-official knew, or should have known, that the condition posed an excessive risk to health or safety." *Id*. at 35.

Numerous courts have held that unpleasant or unsanitary conditions only rise to the level of a Constitutional violation if they amount to an objectively and sufficiently serious denial of the minimal civilized measure of life's necessities. *Id.* at 30-32. Furthermore, a plaintiff must proffer facts to show "an official's deliberate indifference to those conditions, or that that those conditions are punitive." *Id.* at 34 n.12.

"[C]onditions of confinement may be aggregated to rise to the level of a constitutional violation, but 'only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise.'" *Id.* at 30 (citing *Walker*, 717 F. 3d at 125). To properly assess whether conditions are sufficiently serious, the plaintiff must include information about the duration and severity of them, otherwise they may be dismissed. *See, e.g.*, *Figueroa v. County of Rockland*, 2018 WL 3315735, at *7 (S.D.N.Y. July 5, 2018) (dismissing conditions-of-confinement claim alleging lack of ventilation, insect infestation, and feces/bodily fluids on the walls because plaintiff did not provide details as to duration of conditions); *Jackson v. Sullivan County*, 2018 WL 1582506, at *4 (S.D.N.Y. Mar. 27, 2018) (dismissing conditions-of-confinement claim in absence of allegations regarding severity and duration).

    *i.*   *Showers and Razors*

  Plaintiff alleges that ADW Henry, Deputy Warden Shivraj, CO Drumwright, CO Ramirez, CO Edmunds, CO Ramirez, Captain Carter, Captain Vallejo, CO Taylor, Captain Loiseau, Captain Blake, and CO Montenegro deprived him showers, razors, or exercise on certain days in November 2020.  (SAC ¶¶ 2-4 7-8, 12, 16, 19, 22, 24, 28, 30, 41, 42, 56, 61.)  These allegations do not rise to the level of a Constitutional violation, either alone or in the aggregate, as they suggest episodic deprivations.  Plaintiff asserts that showers and razors were denied on various dates, but also concedes that showers and razors were otherwise afforded.  For example, on November 6, 2020, Plaintiff was denied a shower by CO Ramirez (SAC ¶ 22), but on the same day Warden Dunbar allowed Plaintiff to shower (SAC ¶ 26).

  Moreover, Plaintiff fails to assert how denials of a shower or razor on occasion posed an objective risk of serious harm to him.  *See Trammell v. Keane*, 338 F.3d 155, 165 (2d Cir. 2003) ("Deprivation of other [than toilet paper] toiletries for approximately two weeks—while perhaps uncomfortable—does not pose such an obvious risk to an inmate's health or safety to suggest that the defendants were 'aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed], and [that they also drew] the inference.'") (citation omitted); *Thorpe v. Vill. of Greenwich*, 2014 WL 788816, at *10 (N.D.N.Y. Feb. 25, 2014) ("Courts are reluctant to consider even a temporary deprivation of showers a constitutional violation.").  Thus, Plaintiff's allegations against ADW Henry, Deputy Warden Shivraj, CO Drumwright, CO Ramirez, CO Edmunds, CO Ramirez, Captain Carter, Captain Vallejo, CO Taylor, Captain Loiseau, Captain Blake, and CO Montenegro concerning denial of showers and razors are insufficient to state a claim that his Constitutional rights were violated.

ii.    *Recreation*

Plaintiff insufficiently alleges that CO Ramirez denied him recreation on November 5, 2020 (SAC ¶ 12), and Captain Vallejo on November 7, 2020 (SAC ¶ 30), as he fails to show the requisite intent or indifference to his health and safety or any injury resulting from a few episodes of exercise deprivation.[5]  *Gamble v. City of New York ex rel. NYC Dep't of Correction*, 2009 WL 3097239, at *5 (S.D.N.Y. Sept. 25, 2009) (holding that "[s]poradic infringement of the right to exercise does not rise to the level of to a constitutional deprivation.").

Plaintiff also asserts that the recreation yard did not have any recreation equipment for him to use (SAC ¶ 52), and he had to wake up early in the morning to place himself on the recreation list for each day, which was a form of punishment (SAC ¶ 76).  However, Plaintiff does not allege that the lack of recreation equipment in the yard deprived him of an opportunity to exercise.  Additionally, prisoners are not Constitutionally guaranteed recreational equipment.  *Anderson v. Coughlin*, 757 F.2d 33, 34-36 (2d Cir. 1985).  Further, Plaintiff's conclusory allegation that waking up early in the morning to place himself on the recreation list was a punishment is insufficient to state a claim insofar as there was no objectively serious risk to his health of having to wake up at 6:00 a.m.  Thus, Plaintiff's allegations against CO Ramirez and Captain Vallejo concerning denials of exercise do not state a claim that his Constitutional rights were violated.

iii.    *Television, Commissary, and Food*

Plaintiff alleges he was denied a television in his cell and his access to the commissary was restricted.  (SAC¶ 77.)  However, Plaintiff has no Constitutional right to a television in his

---

[5] Plaintiff also alleges that he was placed in enhanced restraints during recreation.  That claim is addressed below.

cell or access to the commissary.  *See Rosales v. LaValley*, 2014 WL 991865, at *11 (N.D.N.Y.

Mar. 13, 2014) ("It is well established that prison inmates do not have a constitutional right to

watch television because the amenity is not considered a necessity for inmates."); *Wingate v.

City of New York*, 2014 WL 3747662, at *1 (E.D.N.Y. July 25, 2014) ("Prisoners, including pretrial

detainees, do not have . . . a constitutional right to the use of a prison commissary.").

Moreover, Plaintiff failed to assert any injury caused by denials of television in his cell and

access to the commissary, or that watching television or accessing the commissary were

entirely denied.  Thus, Plaintiff's allegations concerning denials of television in his cell and

access to the commissary do not state a claim that his Constitutional rights were violated.

Plaintiff alleges that his lunch was served cold and without a food handling certificate by

CO Drumwright (SAC ¶ 9), CO Nzeama (SAC ¶ 11), and CO Ramirez (SAC ¶ 14), which violated

DOC directives.  However, such allegations are not Constitutional violations.  *Smith v.

Westchester County*, 2021 WL 2856515, at *8 (S.D.N.Y. July 7, 2021) ("[F]ood merely served

cold or in an unpleasing manner is too frivolous of a claim to constitute a constitutional

violation.").  Plaintiff does not allege that his food was undercooked, rotten, or presented a

serious health hazard.  *But see Hall v. Westchester County*, 2021 WL 795165, at *5 (S.D.N.Y.

Mar. 1, 2021) (Plaintiff adequately pleaded serious conditions where he was "regularly being

served undercooked and bloody meat, moldy bread, and juice containers with mold around

them, all of which are obvious health hazards," he found "foreign objects, including a metal clip

and flies, as well as phlegm in his food on several occasions," his "food was prepared in

unsanitary conditions" and " old food was served").  Thus, Plaintiff's allegations against CO

Drumwright, CO Nzeama, and CO Ramirez concerning his food are insufficient to state a claim that his Constitutional rights were violated.

> iv.   *Phone Calls and Non-Legal Mail*

Courts within this circuit have generally held that restrictions on telephone usage are Constitutional as long as alternative means of communicating with others outside of prison are available.  *Pape v. Cook*, 2021 WL 2186427, at *6 (D. Conn. May 28, 2021) (collecting cases); *see also Henry v. Davis*, 2011 WL 3295986, at *2 (S.D.N.Y. Aug. 1, 2011) ("Phone restrictions do not impinge on a prisoner's constitutional rights where an inmate has alternate means of communicating with the outside world, and particularly with counsel.").

"Under the First Amendment, prisoners have a right to the free flow of incoming and outgoing mail." *Johnson v. Goord*, 445 F.3d 532, 534 (2d Cir. 2006).  However, the right of a prisoner to receive and send mail may be regulated.  *Id.*  Such regulations are valid if they are "reasonably related to legitimate penological interests," and are not an "exaggerated response to prison concerns." *Turner v. Safley*, 482 U.S. 78, 90-91 (1987).  "In balancing the competing interests implicated in restrictions on prison mail, courts have consistently afforded greater protection to legal mail than to non-legal mail." *Johnson*, 445 F.3d at 534.

Here, Plaintiff only alleges that he was denied the right to mail letters and make phone calls, each on two occasions, in November 2020.  Such denials are insufficient to show a deprivation of a Constitutional right. *See Torrez v. Semple*, 2018 WL 2303018, at *5 (D. Conn. May 21, 2018) ("The fact that Torrez may have been without mail service for ten days does not constitute a deprivation of a life necessity or basic human need."); *Banks v. Argo*, 2012 WL 4471585, at *6 (S.D.N.Y. Sept. 25, 2012) (dismissing Constitutional claims of incarcerated pro se

plaintiff challenging restriction on telephone calls and mail communications that lasted up to thirteen days); *Smith v. City of New York*, 2015 WL 1433321, at *7 (S.D.N.Y. Mar. 30, 2015) (dismissing claim of interference of non-legal mail for failing to allege specific incidents where plaintiff fails to allege interference with outside world was significantly impaired).

That Plaintiff was subject to restrictions on his ability to communicate based on the JLO underscores the penological interests of the limitations put in place, namely the CLO.   To the extent that Plaintiff's claim of censorship and delay concerns his outgoing non-privileged mail and in light of the JLO finding that Plaintiff posed a danger to prosecution witnesses and that mail monitoring was necessary to protect the safety of witnesses, there is a legitimate governmental interest in monitoring Plaintiff's non-privileged mail.   Thus, Plaintiff's allegations concerning the monitoring of his non-privileged outgoing mail are insufficient to state a claim that his Constitutional rights were violated.

Lastly, Plaintiff's claim is also deficient because he does not allege any injury from the denials of making phone calls and sending mail to his mother and grandmother.   *See Fair v. Weiburg*, 2006 WL 2801999, at *7 (S.D.N.Y. Sept. 28, 2006) ("Nothing in Plaintiff's Complaint provides any basis for finding that the temporary denial of his desire to use the phone to call his mother constituted an urgent condition that might approach the "serious injury" requirement[.]").   Thus, Plaintiff's allegations concerning denial of phone calls to his mother and grandmother are insufficient to state a claim that his Constitutional rights were violated.

Allegations concerning conditions of confinement similar to those of Plaintiff have been found insufficient to state a claim.   *See, e.g., Reid v. City of New York*, 2021 WL 3477243, at *11-12 (S.D.N.Y. Aug. 6, 2021), *report and recommendation adopted*, 2021 WL 4177756 (S.D.N.Y.

Sept. 14, 2021) (recommending dismissal of claims of pretrial detainee who complained about unsupportive mattress, denial of indoor exercise, denial of adequately warm footwear for outdoor recreation in winter); *Washington v. Falco*, 2021 WL 797658, at *5 (S.D.N.Y. Mar. 1, 2021) (dismissing pretrial detainee's conditions of confinement claim alleging refusal to provide recreational equipment and allotting only one to three hours for exercise were conditions imposed on all individuals in restricted housing area and not punitive); *Trimmier v. Cook*, 2020 WL 5231300, at *5 (D. Conn. Sept. 2, 2020) (finding in relevant part that the limited daily telephone calls and recreation, and restrictions on commissary spending do not constitute deprivations of Trimmier's basic human needs, such as food, clothing, shelter, medical care or safety).

Thus, I recommend granting the motion to dismiss with respect to Plaintiff's claims based on denials of showers, razor, recreation, television, commissary, phone calls to his mother and grandmother, and serving food cold and without a certificate.

## 5. ACCESS TO COUNSEL AND THE COURTS

### a. *Communication*

A pretrial detainee's Sixth Amendment rights are violated when a prison regulation unjustifiably obstructs, infringes, unreasonably burdens or significantly interferes with his access to counsel. *Patterson v. Ponte*, 2017 WL 1194489, at *4 (S.D.N.Y. Mar. 30, 2017), *report and recommendation adopted*, 2017 WL 1405753 (S.D.N.Y. Apr. 17, 2017) (citations omitted). To the extent access is restricted based on an institutional rule, the court must evaluate the restriction in light of the goal of institutional security. *Bell v. Wolfish*, 441 U.S. 520, 547 (1979); *Kingsley v. Hendrickson*, 576 U.S. 389, 398 (2015). Courts also have recognized that prisoners

do not have a right to unlimited telephone calls to counsel and that day and time limitations

may be imposed. *See, e.g., Bellamy v. McMickens*, 692 F. Supp. 205, 214 (S.D.N.Y. 1988); *Pino v.*

*Dalsheim*, 558 F. Supp. 673, 675 (S.D.N.Y. 1983); *Patterson*, 2017 WL 1194489, at *3-4

(postponement of one phone call and inability to speak with a paralegal on one occasion did

not unreasonably burden right to counsel).  "Correctional officials may regulate contact with

attorneys to a point" to, for example, keep staff, detainees and witnesses safe and prevent

escape. *Benjamin v. Fraser*, 264 F.3d 175, 185 (2d Cir. 2001).  However, regulations must be

reasonably necessary to address these legitimate penological concerns. *Id*.

The Sixth Amendment right to counsel includes the right to communicate with counsel

in confidence. *Weatherford v. Bursey*, 429 U.S. 545, 554 n. 4 (1977) ("[T]he Sixth Amendment's

assistance-of-counsel guarantee can be meaningfully implemented only if a criminal defendant

knows that his communications with his attorney are private and that his lawful preparations

for trial are secure against intrusion by the government, his adversary in the criminal

proceeding."); *United States v. Rosner*, 485 F.2d 1213, 1224 (2d Cir. 1973) ("[T]he essence of

the Sixth Amendment right is, indeed, privacy of communication with counsel.").

Here, Plaintiff alleges that his request to call his attorney was denied by an unidentified

person on November 3.  (SAC ¶ 2.)  Although Plaintiff asserts that he requested to take a

shower and call his attorney on November 7 by CO Drumwright (SAC ¶ 7), he does not allege

that CO Drumwright denied his request to call his attorney, only his shower.  Similarly, Plaintiff

alleges that he requested to take a shower and "to use the phone" later on the same day, but

ADW Henry denied his request for shower only (SAC ¶ 8); no allegations exist that Plaintiff's

requests to call his attorney or "to use the phone" were denied by ADW Henry.  Although

Plaintiff asserts that CO K. Young informed him he "would not be coming to the housing unit every three (3) hours to afford the plaintiff a phone call" (SAC ¶ 35), and, on November 23, 2020, CO K. Young and CO Rodriguez informed Plaintiff that he would not be making any more phone calls if he "get[s] my warden in trouble" (SAC ¶ 57), he does not allege that CO K. Young and CO Rodriguez denied him phone calls.

Plaintiff also fails to allege that a single denial of his request to call his attorney by an unidentified person unreasonably burdened his right to consult with his attorney or access the courts, and thus his allegation is insufficient to state a claim. *Bellamy*, 692 F. Supp. at 214 ("Although prisoners have a right to access counsel from prison, they have no right to unlimited telephone call" and "restrictions on inmates' access to counsel via the telephone may be permitted as long as prisoners have some manner of access to counsel.").  For these reasons, Plaintiff's allegations concerning denial of a phone call to his attorney are insufficient to state a claim that his Constitutional rights were violated.

As to communicating in confidence, Plaintiff sufficiently states a claim based on his allegations that CO Ritter and CO Hickson purposely stood in front of his cell door when he was discussing his criminal and civil cases with his attorney.  (SAC ¶ 31.)  "Courts in this Circuit have held that forcing pretrial detainees to consult with counsel in non-private areas where their conversations may be overheard by correctional staff or other inmates is violative of the pretrial detainees' Sixth Amendment right to counsel."  *Demuth v. Chenango Cnty. Sheriff's Off.*, 2020 WL 929736, at *8 (N.D.N.Y. Jan. 24, 2020), *report and recommendation adopted sub nom.*, *Demuth v. Cutting*, 2020 WL 918739 (N.D.N.Y. Feb. 26, 2020).  Here, both CO Ritter and CO Hickson were in a position to overhear Plaintiff's conversation with his attorney, thus

violating his right to counsel.  Accordingly, I recommend denying Defendants' motion to dismiss this claim as to Defendants CO Ritter and CO Hickson.

  **b.  *Legal Mail***

  "[A] prisoner's right to the free flow of incoming and outgoing mail is protected by the First Amendment," and courts "have consistently afforded greater protection to legal mail than to non-legal mail, as well as greater protection to outgoing mail than to incoming mail." *Traore v. Rikers Island C-95 & C-76*, 2022 WL 1556946, at *3 (S.D.N.Y. May 16, 2022) (citations omitted).  Under the First Amendment, "[r]estrictions on prisoners' mail are justified only if they "further[ ] one or more of the substantial governmental interests of security, order, and rehabilitation [and] must be no greater than is necessary or essential to the protection of the particular governmental interest involved." *Davis v. Goord*, 320 F.3d 346, 351 (2d Cir. 2003) (citation omitted).  The Second Circuit has held that prison officials can only open an inmate's outgoing legal mail if there is a "rational justification" for doing so.  *Davidson v. Scully*, 694 F.2d 50, 54 (2d Cir. 1982) (citing *Wolfish*, 573 F.2d at 130.).

  While a prisoner has a right to be present when his legal mail is opened, an isolated incident of mail tampering is usually insufficient to establish a Constitutional violation.  *Wolff v. McDonnell,* 418 U.S. 539, 574–76(1974).  The Second Circuit has found that "two incidents of mail tampering could constitute an actionable violation (1) if the incidents suggested an ongoing practice of censorship unjustified by a substantial government interest, or (2) if the tampering unjustifiably chilled the prisoner's right of access to the courts or impaired the legal representation received."  *Id.*  "The inmate must show that prison officials 'regularly and

unjustifiably interfered with the incoming legal mail.'" *Johnson v. Barone*, 2022 WL 344272, at *3 (D. Conn. Feb. 4, 2022) (quoting *Davis*, 320 F.3d at 351).

"The First Amendment protects prisoners' access to mail directly, unlike the right of access to courts, which protects prisoners' access to mail only derivatively and with respect to given claims." *Bellezza v. Holland*, 2011 WL 2848141, at *6 (S.D.N.Y. July 12, 2011). "The right of access to courts gives rise to a number of derivative rights, including the right of inmates to receive [and send] legal mail without interference." *Id.* at *4. "To state a claim for denial of access to the courts—in this case due to interference with legal mail—a plaintiff must allege that the defendant 'took or was responsible for actions that hindered [a plaintiff's] efforts to pursue a legal claim.'" *Davis*, 320 F.3d at 351 (internal quotation marks and citation omitted). "Unlike prisoners who bring a claim for the violation of a constitutionally protected right, who have standing to assert that right even if the denial of the right did not cause an 'actual injury,' prisoners who bring a claim for the violation of a derivative right of access to the courts must demonstrate 'actual injury' in order to have standing." *Collins v. Goord*, 581 F. Supp. 2d 563, 573 (S.D.N.Y. 2008) (citing *Benjamin*, 264 F.3d at 185).

Although Plaintiff alleges that he was not allowed to send any mail on November 13, 2020 by CO Ritter, CO Hickson and CO White (SAC ¶ 43) and Warden Dunbar (SAC ¶ 45), he does not assert that such mail included mail to his attorney. The only allegation concerning denial of Plaintiff's outgoing mail to his attorney is that, on November 15, 2020, CO K. Young denied it. (SAC ¶ 49.) However, Plaintiff does not allege that he was denied other means of communication with his attorney or that a single denial of outgoing mail to his attorney impeded in any way preparation of defense in his underlying criminal case. Thus, Plaintiff's

allegations against CO K. Young concerning a denial of his outgoing mail to his attorney are insufficient to state a claim that his Constitutional rights were violated.

Plaintiff further asserts that his legal outgoing mail to his attorney was censored by CO Hickson and CO K. Young, who informed Plaintiff that sending mail would be useless because CO K. Young would have to read all Plaintiff's outgoing mail.  (SAC ¶ 34.)  Plaintiff asserts that Capt. Molina, CO K. Young, and CO W. Rodriguez did exactly that when they "admitted on Jan. 5, 2021" that the Plaintiff's mail to his attorney "was held since Dec. 22, 2020," and opened and inspected without notification (SAC ¶ 87).

Here, the JLO provides that Plaintiff is not permitted to send out any mail without inspection and his privileged, outgoing legal mail to his attorney is not exempted.  (ECF No. 32-2.)  However, the JLO also provides that Plaintiff shall be afforded six hours per week to prepare for trial, during which he may write letters that would be given to correctional personnel who "will promptly place them in an envelope, *unread*, and promptly provide these materials to the jail security office[.]"  (*Id.*) (emphasis added).  The security office was then to "inspect each piece of mail to determine if it contains any threats or represents an attempt to have others convey threats, or otherwise presents any possible security concerns."  (*Id.*)

Defendants have failed to articulate any legitimate penological interest in the need for reading Plaintiff's privileged, outgoing legal mail to his attorney.  Despite, the JLO providing that Plaintiff's mail should be inspected, it also makes clear that his legal mail was to be unread.  Further, courts have noted there is greater protection for legal mail. *See Wolff*, 418 U.S. at 577; *Davis*, 320 F.3d at 352 (2d Cir. 2003) (noting Plaintiff's outgoing legal mail is subject to greater Constitutional protection because of the lesser security concerns presented). *Cancel v. Goord*,

2001 WL 303713, at 7 (S.D.N.Y. Mar. 29, 2001) (The Second Circuit has held that prison officials can only open an inmate's outgoing legal mail if there is a rational justification for doing so); *Smith v. City of New York*, 2015 WL 1433321, at *6 (S.D.N.Y. Mar. 30, 2015) (noting that Defendant's contention that its policy is necessary to ensure that the mail is for Plaintiff and not another court-ordered lock-down inmate, does not constitute a sufficient justification for the prison to inspect legal mail).

Accordingly, to the extent that Plaintiff alleges his privileged, outgoing legal mail to his attorney was censored and delayed for inspection, at this stage of the litigation, Plaintiff's allegations against CO Hickson, CO K. Young, Capt. Molina, and CO W. Rodriguez are sufficient to state a claim that his Constitutional rights under the First and the Sixth Amendments were violated.

### c. *Access to Courts*

Although Plaintiff alleges that his request for a typewriter to write to the judge in his state court action was denied by an unidentified person because the housing unit did not have one (SAC ¶ 32), he fails to assert that he could not have handwritten his correspondence. This dooms his access to courts claim. *See Means v. Rockland Cnty. Corr. Facility*, 2019 WL 1596489, at *7 (S.D.N.Y. Apr. 15, 2019) (finding that plaintiff's assertion that correction officials denied him access to the courts by failing to provide him law books, paper, typewriter, and free telephone calls insufficient to support a claim of denial of access to courts because plaintiff had access to materials to submit to the Court his handwritten complaint); *see also Fusco v. Westchester Cnty. Dep't of Corr.*, 2021 WL 1254215, at *4 (S.D.N.Y. Apr. 1, 2021).

6.  **MEDICAL CLAIMS**

When evaluating a claim of deliberate indifference to medical needs by a pretrial detainee, the same basic two-prong test described above applies.  That is, the deprivation must be sufficiently serious, and the defendant must act with a sufficiently culpable state of mind. *Darnell*, 849 F.3d at 29; *Charles v. Orange County*, 925 F.3d 73, 87 (2d Cir. 2019) ("Although Darnell did not specifically address medical treatment, the same principle applies here.").  When assessing the subjective, or mens rea prong, the court assesses whether "an objectively reasonable person in [d]efendant's position would have known, or should have known, that [d]efendant's actions or omissions posed an excessive risk of harm" to the plaintiff.  *Davis*, 283 F. Supp. 3d at 120 (citing *Darnell*, 849 F.3d at 35).  "[S]omething more than negligence is needed to elevate a claim of medical misconduct to a constitutional tort."  *Id.* at 121 (citing *Darnell*, 849 F.3d at 36).

> ### a.  *Complaints Against Non-Medical Staff*

Plaintiff's allegations fail to establish both the objective and subjective prongs to support a claim of medical indifference.  Specifically, Plaintiff alleges that his mental health medication was denied on November 5 and 27, 2020 by an unidentified person, and November 6, 2020 by CO Ramirez (SAC ¶ 22) and Captain Carter (SAC ¶ 24).  Plaintiff further alleges that on November 8, 2020, CO K. Young brought him his mental health medication instead of medical personnel (SAC ¶ 36), and on November 27, 2020, his request to see medical staff about shoulder pain was denied by an unidentified person (SAC ¶ 60).

Importantly, Plaintiff does not allege any specific facts showing that denial of mental health medication on two days, administration of mental health medication by a prison official

instead of medical personnel, and the denial of a request to see medical staff on one occasion

exposed him to any sufficiently serious harm or that the prison officials acted with the requisite

*mens rea*.  Thus, Plaintiff's allegations are insufficient to state a claim for deliberate indifference

to his medical needs.

> ### *b.  Dr. Blackmore and Dr. Gemo*

Plaintiff alleges that on November 9, 2020, Dr. Blackmore refused to examine him for

shoulder pain (SAC ¶ 38), and on November 16, 2020, that he informed Dr Blackmore he was

having suicidal thoughts, but that Dr. Blackmore told him that permission was needed from the

Warden to speak to mental health staff due to CLO 370.20.  (SAC ¶ 50.)  Plaintiff asserts that Dr

Gemo informed him, on November 19, 2020, that he would have to be examined through his

cell door due to the CLO 370.20.  (SAC ¶ 53.)

Plaintiff's allegation that Dr. Blackmore refused to examine him on one occasion for

shoulder pain does not sufficiently plead deliberate indifference to serious medical needs, as

Plaintiff fails to assert any facts suggesting his shoulder pain required immediate medical

intervention or that Dr. Blackmore knew or should have known that Plaintiff's shoulder pain

posed an excessive risk to his health.  *Darnell*, 849 F.3d at 35.  Similarly, that Dr. Blackmore

merely informed him of a procedure regarding mental health treatment does not state a claim

for a violation of Constitutional rights.  Further, Plaintiff does not allege that Dr. Blackmore

subjectively believed he was a suicide risk to support a medical indifference claim.  *See Fontaine*

*v. Cornwall*, 2019 WL 4257136, at *7 (N.D.N.Y. Sept. 9, 2019) ("Without establishing [the social

worker's] subjective awareness that plaintiff was an active suicide risk, his deliberate

indifference claim against her must be dismissed.").

As to Dr. Gemo, Plaintiff does not allege that Dr. Gemo denied treatment to him, only that Dr. Gemo informed him that he would have to examine him through the cell door.  This too is insufficient to give rise to a Constitutional violation.  Accordingly, Plaintiff's allegations against Dr. Blackmore and Dr. Gemo are not sufficient to state a claim of deliberate indifference to his medical needs and should be dismissed.[6]

### 7.  FIRST AMENDMENT RETALIATION

"[I]t is well established that 'retaliation against a prisoner for pursuing a grievance violates the right to petition government for the redress of grievances guaranteed by the First and Fourteenth Amendments and is actionable under § 1983.'"  *Dolan v. Connolly*, 794 F.3d 290, 294 (2d Cir. 2015) (quoting *Graham v. Henderson*, 89 F.3d 75, 80 (2d Cir.1996)).  A plaintiff asserting First Amendment retaliation claims must allege "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action."  *Id.* (quoting *Espinal v. Goord*, 558 F.3d 119, 129 (2d Cir. 2009)).  The filing of a prison grievance is protected activity.  *Id.*  To constitute an adverse action, the retaliatory conduct has to be of a nature that it would "deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights[.]"  *Davis*, 320 F.3d at 353 (quoting *Dawes v. Walker*, 239 F.3d 489, 491 (2d Cir.2001)).

---

[6] Although Dr. Gemo has yet to appear in this action, he may be dismissed *sua sponte* as the allegations are substantially similar to those alleged against Dr. Blackmore.  *See Hecht v. Com. Clearing House, Inc.*, 897 F.2d 21, 26 (2d Cir. 1990) (affirming sua sponte dismissal of all defendants, despite one defendant not appearing in the case or joining the motion to dismiss because the issues against that defendant were substantially the same as those concerning the other defendants); *see also Frein v. Feinstein*, 2021 WL 2715799, at *3 (W.D.N.Y. July 1, 2021).

"[T]o satisfy the causation requirement, allegations must be sufficient to support the inference that the speech played a substantial part in the adverse action." *Id.* at 354 (cleaned up). When determining a causal connection, courts may infer a retaliatory motive in the adverse action from: (1) "the temporal proximity of the filing to the grievance and the disciplinary action"; (2) "the inmate's prior good disciplinary record"; (3) "vindication at a hearing on the matter"; and (4) "statements by the defendant regarding his motive for disciplining the plaintiff." *Thomas v. DeCastro*, 2019 WL 1428365, at *9 (S.D.N.Y. Mar. 29, 2019) (quoting *Barnes v. Harling*, 368 F. Supp. 3d 573, 600 (W.D.N.Y. 2019)); *see also Espina*, 558 F.3d at 129.

Here, Plaintiff sufficiently alleges that CO K. Young informed him that restrictions on him will continue until Plaintiff and other inmates "figure out a way to get" inmate Williams to stop his complaints because he is the reason why restrictions are imposed on everyone else. (SAC ¶¶ 63-64, 66-68.) He also asserts that CO K. Young imposed restrictions on him in retaliation for refusing to assault inmate Williams. (SAC ¶¶ 88-91.) For example, Plaintiff alleges that his legal mail was withheld, delayed, and/or refused. (*Id.*; SAC ¶¶ 63, 68.) Plaintiff's desire to send legal mail is protected by both the First and Sixth Amendments. *See Traore*, 2022 WL 1556946, at *3; *Patterson*, 2017 WL 1194489, at *4. As alleged, CO K. Young took adverse action against Plaintiff by refusing to send his legal mail and reminding Plaintiff approximately one week later that he still had his legal mail and it would only be mailed after he attacked inmate Williams. (SAC ¶ 68.) Thus, as alleged, the refusal to send legal mail because Plaintiff refused to attack another inmate is sufficient to state a claim. *See Bryant v. Higbee*, 2017 WL 4365988, at *16 (D.N.J. Sept. 29, 2017) (finding that Plaintiff has adduced sufficient evidence, through his sworn

testimony and additional evidence in the record, for a reasonable fact-finder to conclude that

he was retaliated against by refusing to assault another inmate at defendant's behest); *see also*

*Lewis v. Hanson*, 2022 WL 991729, at *26 (N.D.N.Y. Mar. 31, 2022) ("a retaliatory transfer to a

facility with more restrictions constitutes an adverse action sufficient to discourage other

inmates form exercising their right").

      However, to the extent Plaintiff alleges the restrictions placed on him, such as limited

communication and 23/1 lockdown were retaliatory, he is incorrect.  Those restrictions were

imposed due to the JLO, which was implemented through the CLO.  Accordingly, as these

restrictions stem directly from the state court judge's determination that Plaintiff required

substantial monitoring, comments made, or actions taken by CO K. Young against the Plaintiff

that were ordered by the JLO cannot support a retaliation claim.

      Plaintiff also alleges that, on December 27, 2020, and January 29, 2021, CO K. Young

offered Plaintiff more phone calls if Plaintiff would cause harm to inmate Williams, and that he

filed a grievance about that matter, which is still pending.  (SAC ¶¶ 63, 75.)  According to

Plaintiff, Defendants knew that no restrictions on Plaintiff existed but acted in concert and

imposed them on him in retaliation for his refusing to assault inmate Williams.  (SAC ¶¶ 88-91.)

Plaintiff's allegations that CO K. Young promised him more phone calls if Plaintiff harmed

inmate Williams do not constitute either protected conduct by Plaintiff or adverse action by CO

K. Young, the requisite elements of the retaliation claim.  Although Plaintiff alleges that, after

CO K. Young made his offer for more phone calls in exchange for Plaintiff harming inmate

Williams in January 2021, he filed a grievance in connection with that matter, the SAC is devoid

of any allegations that CO K. Young or any other Defendant took adverse action because of that

grievance.  To the extent that Plaintiff claims that restrictions were imposed on him by Defendants after they were lifted in December 2020 (SAC ¶¶ 67, 73), the JLO restrictions were lifted by the state court on June 8, 2021, not in December 2020.  (ECF No. 32-4.)  Plaintiff does not allege that any restrictions were imposed on him or any adverse action taken against him by any Defendant after they were lifted on June 8, 2021.  Thus, these allegations are insufficient to state a claim for retaliation under the First Amendment.

Likewise, to the extent Plaintiff alleges that comments made to him by prison staff are retaliatory in nature, those are insufficient to state a claim.  Specifically, Plaintiff alleges that CO K. Young insulted Plaintiff calling him "Lil Nigga" and a "rapist" (SAC ¶ 36), and CO McNeil called him a rapist and asked him how he would like it if he "raped your mother?"  (SAC ¶ 37).  Allegations of verbal abuse and threats unaccompanied by physical injury do not suffice to state a claim of Constitutional violations under 42 U.S.C. § 1983.  *See Cole v. Fischer*, 379 F. App'x 40, 43 (2d Cir. 2010) ("Verbal harassment, standing alone, does not amount to a constitutional deprivation."); *Cuoco v. Moritsugu*, 222 F.3d 99, 109 (2d Cir. 2000) (noting that "rudeness and name-calling does not rise to the level of a constitutional violation"); *Hudson v. Lockhart*, 554 F. Supp.2d 494, 497 (S.D.N.Y. 2008).  Thus, even if taken as true, that CO K. Young and CO McNeil used such abhorrent language, that alone, with no additional allegations of retaliation or physical injury, fails to implicate a Constitutional violation.

## 8.  DUE PROCESS CLAIMS RELATED TO REQUIREMENT OF ENHANCED RESTRAINTS

Plaintiff claims that his procedural and substantive due process rights were violated by being designated a CMC case and placed in enhanced restraints without a hearing, including when he was taken to shower or recreation.  CLO 370.20 required enhanced restraints when

Plaintiff was outside of his cell.  Plaintiff was placed in restraints during recreation and when being transported to the shower.  Plaintiff's complaints implicate his substantive and procedural due process rights under the Fourteenth Amendment, addressed below.

### a. Fourteenth Amendment Substantive Due Process

"In evaluating the constitutionality of conditions or restrictions of pretrial detention that implicate only the protection against deprivation of liberty without due process of law," the Supreme Court held that "the proper inquiry is whether those conditions amount to punishment of the detainee."  *Bell*, 441 U.S. at 535.  "[I]in determining whether particular restrictions and conditions accompanying pretrial detention amount to punishment in the constitutional sense of that word," courts "must decide whether the disability is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose."  *Id.* at 538.  The Supreme Court explained that, "in the absence of an expressed intent to punish, a pretrial detainee can nevertheless prevail by showing that the actions are not 'rationally related to a legitimate nonpunitive governmental purpose' or that the actions 'appear excessive in relation to that purpose.'"  *Kingsley*, 576 U.S. at 398 (quoting *Bell*, 441 U.S. at 541-43)); *Edrei v. Maguire*, 892 F.3d 525, 535 (2d Cir. 2018).

In *Hunter v. City of New York*, the plaintiff challenged his placement in a segregated housing unit and being subjected to additional restrictions including enhanced security restraints.  2015 WL 5697218, at *1 (S.D.N.Y. Sept. 28, 2015).  The court granted summary judgment finding that there was no evidence that any of the conditions, including the enhanced restraints, were intended to punish him or imposed for any purpose other than the prison's legitimate goal of complying with a state court order mandating that Plaintiff be prevented

from making phone calls except to his attorney and prevented from writing or directing others to write to the victim of Plaintiff's crime due to Plaintiff's prior harassing conduct toward the victim. *Id.* at *9-16; *see also Brown v. Doe*, 2014 WL 5461815, at *7 (S.D.N.Y. Oct. 28, 2014) (pretrial detainee failed to state claim for substantive due process violation when conditions of confinement imposed to enforce a court order).

Because the implementation of the CLO implicates other Constitutional protections, namely access to counsel, as discussed above, the analysis below focuses on Plaintiff's allegations related to being placed in enhanced restraints, which is assessed under the Fourteenth Amendment as Plaintiff is a pretrial detainee. Here, the CLO imposed security restrictions on all inmates under court ordered lockdown status, including Plaintiff, and established policy and procedures for the care, custody, and control of those inmates. The Lockdown Order was found necessary by the state court to achieve the purpose of preventing Plaintiff from comminating with others. Other cases have found that orders similar to the CLO are generally applicable and not issued to punish a particular detainee and are rationally related to a legitimate governmental objective of complying with the mandates of orders similar to Plaintiff's Lockdown Order. *See e.g., Hunter*, 2015 WL 5697218.

However, to the extent the CLO's mandate is overbroad and inconsistent with the goal of the Lockdown Order, there may be a valid due process claim. For example, it is unclear how placing Plaintiff in enhanced restraints during exercise/recreation is necessary to achieve the mandate of the State Court's Lockdown Order. "Courts have recognized that some opportunity for exercise must be afforded to prisoners." *McCray v. Lee*, 963 F.3d 110, 117 (2d Cir. 2020) (quoting *Anderson v. Coughlin*, 757 F.2d 33, 34–35 (2d Cir. 1985)). Here, Plaintiff alleges that on

November 17, 2020, he was afforded recreation, but Captain Law and CO Dychese told Plaintiff

he had to stay in enhanced restraints during the entire period which deterred him from going

again on November 27, 2020.  (SAC ¶ 52, 59.). The Second Circuit has noted that requiring

enhanced restraints may deprive a prisoner a meaningful opportunity to exercise and that such

law is clearly established.  *See Edwards v. Quiros*, 986 F.3d 187, 192 (2d Cir. 2021) ("we

conclude that there was sufficient evidence for the jury to find that [the warden] had the

requisite state of mind for the entire six-month period during which Edwards was required to

exercise in restraints when outside of his cell"); *McCray*, 963 F.3d at 120 ("In this Circuit the

rights of prisoners to a meaningful opportunity for physical exercise had been clearly

established nearly three decades [ago]"); *see also Brown v. Venettozi*, 2021 WL 323264, at *6

(S.D.N.Y. Feb. 1, 2021).  Thus, Plaintiff has plausibly alleged a violation of his rights regarding

the use of enhanced restraints while exercising.  *See Paul v. LaValley*, 712 F. App'x 78, 79 (2d

Cir. 2018) ("Accordingly, we have agreed with other Circuits that some opportunity for exercise

must be afforded to prisoners, and we have held that this right was clearly established for

qualified immunity purposes by no later than 1985[.]") (internal citations and quotation marks

omitted).

Accordingly, I recommend that the motion to dismiss the substantive due process claim

be denied as to the claim that enhanced restraints were improperly imposed while exercising,

but granted in all other respects.

### b.    *Fourteenth Amendment Procedural Due Process*

To the extent that Plaintiff asserts a liberty interest in not being classified as a CMC

inmate, such a claim warrants dismissal because no liberty interest exists in avoiding prison

classification. *See Pugliese v. Nelson*, 617 F.2d 916, 925 (2d Cir. 1980) ("[J]udicial intervention into the classification of prisoners for monitoring and control purposes would almost inevitably involve the federal courts in the day-to-day operations of our prison system, which are better left to the expertise of prison administration authorities"); *see also Hunter*, 2015 WL 5697218, at *12 (collecting cases).

However, this does not end the inquiry as to whether Plaintiff was entitled to some procedural due process before being designated for placement in enhanced restraints. The level of procedural protection required differs according to the purpose of the confinement. *Benjamin*, 264 F.3d at 190. If the restraint is imposed for disciplinary reasons, a prisoner must be provided written notice, adequate time to prepare a defense, a limited ability to present witnesses and evidence, and a written statement of the reasons for the discipline. *Id.* (citing *Wolff*, 418 U.S. at 561-70). If the restraint is for administrative purposes such as to mitigate a security threat or to segregate pending a completion of a misconduct investigation, an inmate "must merely receive some notice of the charges against him and an opportunity to present his views." *Id.* (citing *Hewitt v. Helms*, 459 U.S. 460, 476 (1983)); *see also Proctor v. LeClaire*, 846 F.3d 597, 608 (2d Cir. 2017) (administrative segregation is permitted if necessary to incapacitate a detainee who poses a security threat or to conduct and complete an investigation into misconduct).

Prison officials also must conduct periodic reviews to determine whether an individual remains a security risk warranting the liberty restriction—a case-by-case factual assessment coupled with the prison conditions and tensions at the time. *Parson v. Miller*, 2018 WL 4233810, at *5 (N.D.N.Y. May 25, 2018), *report and recommendation adopted*, 2018 WL

4228427 (N.D.N.Y. Sept. 5, 2018).  Prison officials are accorded substantial deference in the

adoption of policies and procedures to ensure institutional security.  *Proctor*, 846 F.3d at 610.

The purpose of the CLO is to comply with the State Court Lockdown Order, which is not

disciplinary or purely administrative.  (SAC Ex. A.)  This Court was unable to identify any

Supreme Court or Circuit case setting forth the procedure for assessing or re-assessing

restrictions imposed to implement a court order.  A detainee could of course challenge a State

Court order issued in his underlying criminal case through his defense attorney and notify the

prison if and when the State Court order is lifted, at which time the prison presumably would

cease subjecting the detainee to the internal prison procedures implemented solely to enforce

the State Court order.  But, to the extent a prison order was issued to implement a Court Order,

the prison order presumably would remain in effect without review until the Court Order is

lifted or modified.  A prison could afford a hearing in advance of subjecting a detainee to such

an order so that the detainee could challenge its scope to the extent it exceeded the dictates of

the State Court order; however, the detainee could also go back to the state judge who issued

the order to seek clarification of the restrictions required.  Again, this Court could find no cases

on point.

Since no clearly established law exists establishing that a pretrial detainee, such as

Plaintiff, has a right to a hearing prior to or after imposition of enhanced restraints

implemented purportedly for purposes of implementing a court-issued Lockdown Oder, the

individual Defendants are entitled to qualified immunity on the Plaintiff's claim of violation of

the procedural Due Process Clause of the Fourteenth Amendment.  *See Wills v. Microgenics

Corp.*, 2021 WL 3516419, at *5 (E.D.N.Y. Aug. 10, 2021) (finding defendants were entitled to

qualified immunity because former inmate's due process claim was not clearly established).

Accordingly, dismissal of this claim is warranted.

9.  **USE OF EXCESSIVE FORCE AND ASSAULT BY CO LAWRENCE**

To establish a claim of excessive force, a pretrial detainee "must show only that the

force purposely or knowingly used against him was "objectively unreasonable" given the facts

and circumstances at the time.  *Kingsley*, 576 U.S. 389, 396-97, 403; *Edrei*, 892 F.3d at 534.

Courts consider several factors when determining objective reasonableness, including: the

relationship between the need for the use of force and the amount of force used; the extent of

the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force;

the severity of the security problem at issue; the threat reasonably perceived by the officer;

and whether the plaintiff was actively resisting.  *Edrei, 892 F.3d at 534*; *see also Barnes v.*

*Harling*, 368 F. Supp. 3d 573, 592 (W.D.N.Y. 2019) (discussing factors).

Plaintiff alleges that CO Lawrence used excessive force against him on November 26,

2020, when "the plaintiff was stuck in the cell while a fire was in his cell and then attacked the

plaintiff[.]"  (SAC ¶ 107.)  However, Plaintiff does not allege any facts specifying what CO

Lawrence did that resulted in any injury.  *But see Doe v. NYS Off. of Child. & Fam. Servs.*, 2021

WL 2826457, at *10 (N.D.N.Y. July 7, 2021) (Plaintiff's allegations that defendant "pressed his

knees on C.P.'s back, 'yank[ed her] arms in a violent fashion behind [her] back and tightly

handcuff[ed] them,' punched and kicked her, held her down on a hard floor, and spit on her"

were sufficient to state a claim under substantive due process that Defendant "knowingly used

an objectively unreasonable degree of force.").  Thus, Plaintiff's conclusory allegations that CO

Lawrence used excessive force is insufficient to state a claim and should be dismissed.

**10. MUNICIPAL LIABILITY**

A municipality cannot be held liable under Section 1983 under a respondeat superior theory. *City of Canton v. Harris*, 489 U.S. 378, 392 (1989). Rather, it can be liable only if the Constitutional violations are caused by execution of a government policy or custom, "whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy[.]" *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691, 694 (1978). "Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." *Connick v. Thompson*, 563 U.S. 51, 61 (2011). A plaintiff may demonstrate that such a policy or custom exists by introducing evidence of one of the following:

> (1) a formal policy officially endorsed by the municipality; (2) actions taken by government officials responsible for establishing the municipal policies that caused the particular deprivation in question; (3) a practice so consistent and widespread that, although not expressly authorized, constitutes a custom or usage of which a supervising policy-maker must have been aware; or (4) a failure by policymakers to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees.

*Jones v. Westchester County*, 182 F.Supp.3d 134, 158 (S.D.N.Y. 2016) (quoting *Brandon v. City of New York*, 705 F.Supp.2d 261, 276–77 (S.D.N.Y. 2010)).

When alleging an affirmative municipal policy, "a plaintiff must make factual allegations that support a plausible inference that the constitutional violation took place pursuant either to a formal course of action officially promulgated by the municipality's governing authority or the act of a person with policymaking authority for the municipality." *Missel v. County of Monroe*, 351 F. App'x 543, 545 (2d Cir. 2009). The action of a single decisionmaker who has final

authority may be sufficient to support *Monell* liability.  *Montero*, 890 F.3d at 403.  To determine whether an official has final decisionmaking authority, the official need not be a policymaker for all purposes, rather, "with respect to the conduct challenged, he must be responsible under state law for making policy in that area of the municipality's business."  *Graham v. City of New York*, 2009 WL 909620, at *2 (E.D.N.Y. Mar. 31, 2009) (quoting *Jeffes v. Barnes*, 208 F.3d 49, 57 (2d Cir.2000) (internal quotation marks and alterations omitted)).  Courts have noted that it is often unclear whether wardens may be policymaker to support a *Monell* claim.  *See Id.* (denying summary judgment and noting it is unclear whether Warden Curcio is a policymaker under state law); *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 n.12 (1986) (plurality opinion) (noting in dicta that a county sheriff, for example, may serve as an official policymaker for municipal-liability purposes with respect to some actions but not others); *Elliott v. Mgmt. & Training Corp.*, 2017 WL 3089693, at *7 (N.D. Miss. July 19, 2017) (accepting on summary judgment that the warden may be an official policymaker); *Sugamosto v. Emerald Corr. Mgmt., LLC*, 2013 WL 12333651, at *3 (D.N.M. Feb. 13, 2013) (denying motion to dismiss because plaintiff sufficiently alleged that the warden possessed the authority to craft official prison policy requiring that plaintiff be shackled).

To prevail on a *Monell* claim, a plaintiff must also show that "there is a direct causal link between [the] municipal policy or custom and the alleged constitutional deprivation" he suffered.  *City of Canton*, 489 U.S. at 385.  "When a municipality chooses a course of action tailored to a particular situation, this may also represent an act of official government policy as that term is commonly understood."  *Montero v. City of Yonkers*, 890 F.3d 386, 403 (2d Cir.

2018) (citing *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 125 (2d Cir. 2004)) (internal

quotation marks omitted).

At this stage of the litigation, it is premature to definitively determine whether Warden

Dunbar is a final decisionmaker to support municipal liability, thus dismissal is unwarranted.

Here, Plaintiff alleges and provides documentation that Warden Dunbar drafted and enforced

the CLO, a course of action supposedly tailored to the State Court Lockdown Order.  (*See* SAC ¶

168; SAC Ex. 3.)  To the extent the CLO is overbroad and not tailored for the purpose of

implementing the Lockdown Order, there is a plausible *Monell* claim.  For example, the

Lockdown Order says nothing about requiring Plaintiff to be placed in enhanced restraints

during recreation, yet this was included in the CLO restrictions.  Insofar as the Second Circuit

has indicated that enhanced restraints during recreation time may unconstitutionally burden a

detainees's right to engage in meaningful exercise, the CLO was overbroad.  Thus, a plausible

*Monell* claim is stated as to this aspect of the CLO.

Plaintiff also sufficiently alleges a *Monell* claim as to violations of his Fourteenth

Amendment rights when his legal mail was refused by CO Ritter, CO Hickson, and CO White

who were following orders from Warden Dunbar.  "To establish deliberate indifference a

plaintiff must show that a policymaking official was aware of constitutional injury, or the risk of

constitutional injury, but failed to take appropriate action to prevent or sanction violations of

constitutional rights."  *Jones v. Town of East Haven*, 691 F.3d 72, 81 (2d Cir. 2012).  Here,

Plaintiff alleges that Warden Dunbar was aware of the risk that he had issues with his mail

where on November 13, 20202, he attempted to talk to her about this issue and she said "I

don't have to talk to you about anything[.]"  (SAC ¶ 44.)  Although, the CLO only stated that the

"assigned Captain will collect all letters written by the inmate . . . will turn the mail over to the

Security Office" and that no inmate subject to the CLO will be permitted to send out any

written correspondence, the implementation by the officers appears to be overbroad and

Warden Dunbar was aware of that risk.  (*See* SAC Ex. A.)

Accordingly, I recommend denying Defendants' motion to dismiss Plaintiff's municipal

liability claim only with respect to the equal protection claims relating to being placed in

enhanced restraints when exercising and denying him the ability to send mail.  To the extent

Plaintiff is raising other municipal liability claims, I recommend that those claims be dismissed.

### 11. NEGLIGENT HIRING, RETENTION, TRAINING AND SUPERVISION

In addition to Constitutional claims, Plaintiff asserts state law negligent hiring, retention,

training and supervision claims.  To state a claim for negligent hiring, retention, training and

supervision, a plaintiff must first demonstrate an employee was negligent.  *Mena v. City of New

York*, 2019 WL 1900334, at *5-6 (S.D.N.Y. Apr. 29, 2019).  Once this is established, a plaintiff

must allege:

> (1) that the tort-feasor and the defendant were in an employee-
> employer relationship; (2) that the employer knew or should have
> known of the employee's propensity for the conduct which caused
> the injury prior to the injury's occurrence; and (3) that the tort was
> committed on the employer's premises or with the employer's
> chattels.

*Ehrens v. Lutheran Church,* 385 F.3d 232, 235 (2d Cir.2004) (cleaned up).  In addition, "a claim

for negligent hiring, retention, training or supervision can only proceed against an employer for

an employee acting outside the scope of her employment."  *Id.*; *Mena*, 2019 WL 1900334, at *6

(collecting cases); *Barnville v. Mimosa Café*, 2014 WL 3582878, at *2 (S.D.N.Y. July 10, 2014);

*De'Bey v. City of New York*, 2022 WL 909790, at *8 (S.D.N.Y. Mar. 29, 2022).

Here, Plaintiff does not allege that Defendants acted outside the scope of their employment; rather, he alleges that Defendants stated to him repeatedly that their actions were based on CLO 370.20 and the restrictions contained therein.  Given that Plaintiff does not allege that Defendants acted outside of the scope of their employment, no basis exists for his negligent hiring, retention, training, and supervision claims under New York law.  Hence, I recommend that these claims be dismissed.

### 12.  FALSE IMPRISONMENT

To the extent that Plaintiff attempts to assert a false imprisonment claim, its dismissal is warranted because Plaintiff is confined pursuant to the JLO.  *Holmberg v. County of Albany*, 738 N.Y.S.2d 701, 703 (3d Dep't 2002) ("Generally, where a facially valid order issued by a court with proper jurisdiction directs confinement, that confinement is privileged and everyone connected with the matter is protected from liability for false imprisonment.") (citation omitted).

### 13.  OPPORTUNITY TO AMEND

Plaintiff has had two opportunities to amend his pleadings.  Nothing in the SAC suggests that Plaintiff possesses additional facts that would cure the deficiencies described in this Report and Recommendation.  Therefore, I recommend that at this juncture the deficient claims be dismissed with prejudice.  *See, e.g.*, *Palompelli v. Smith*, 2022 WL 624421, at *6 (S.D.N.Y. Mar. 3, 2022) (dismissing *pro se* plaintiff's complaint with prejudice when there was no suggestion that plaintiff possessed facts that would cure deficiencies in previous complaints) (collecting cases); *Dash v. Mayers*, 2020 WL 1946303, at *9 (S.D.N.Y. Apr. 23, 2020) (dismissing complaint

with prejudice when plaintiff already had one opportunity to amend complaint and court liberally construed opposition in a way that effectively amounted to another pleading).

## CONCLUSION

For the foregoing reasons, I recommend GRANTING the motions to dismiss (ECF No. 31, 56) as to all of Plaintiff's claims **except** (1) under the First and Sixth Amendments against CO Hickson, CO K. Young, Capt. Molina, and CO W. Rodriguez for censoring Plaintiff's privileged, outgoing legal mail to his attorney; (2) under the Sixth Amendment against CO Ritter and CO Hickson in connection Plaintiff's right to confidentially communicate with his attorney; (3) under the First Amendment against CO K. Young for retaliating against Plaintiff; (4) the Fourteenth Amendment Due Process conditions of confinement in connection with being placed in enhanced restraints during exercise against Captain Law and CO Dychese; and (5) the municipal liability claim as to Defendants City of New York and Dunbar with regard to the policy restriction on provision of being placed in enhanced restraints during recreation and restricting his access to mail.

**The Clerk of Court is directed to mail a copy of this Report and Recommendation to Plaintiff.**

Date:  August 8, 2022
          New York, New York

Respectfully submitted,

KATHARINE H. PARKER
United States Magistrate Judge

## NOTICE

**Plaintiff shall have seventeen days, and Defendants shall have fourteen days, from service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure.  *See also* Fed. R. Civ. P. 6(a), (d) (adding three additional days only when service is made under Fed. R. Civ. P. 5(b)(2)(C) (mail), (D)**

(leaving with the clerk), or (F) (other means consented to by the parties)).  A party may respond to another party's objections after being served with a copy.  Fed. R. Civ. P. 72(b)(2).

Plaintiff shall have seventeen days to serve and file any response.  Defendants shall have fourteen days to serve and file any response.  Any objections and any responses to such objections shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable Paul G. Gardephe at the United States Courthouse, 40 Foley Square, New York, New York 10007, and served on the other parties.  *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b).  Any requests for an extension of time for filing objections must be addressed to Judge Gardephe.  The failure to file timely objections shall result in a waiver of those objections for purposes of appeal.  *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b); *Thomas v. Arn,* 474 U.S. 140 (1985).